T.C. Memo. 1999-96


UNITED STATES TAX COURT


SONY AND GWENDOLYN A. JEAN BAPTISTE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1017-97.                    Filed March 29, 1999.


Sony Jean Baptiste, pro se.

<u>Michelle Or</u>, for respondent.


MEMORANDUM OPINION


NAMEROFF, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.[1]  Respondent determined a deficiency in petitioners' 1994
Federal income tax in the amount of $5,183 and an accuracy-
related penalty under section 6662(a) in the amount of $1,037.

---

[1]  Unless otherwise specified, all section references are to
the Internal Revenue Code in effect for the year in issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

The issues for decision are:[2] (1) Whether petitioners received nonemployee compensation in the amount of $14,288; (2) whether petitioners are entitled to deduct Schedule C expenses in the amount of $6,811; and (3) whether petitioners are liable for the accuracy-related penalty under section 6662(a).

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Pasadena, California.

Background

Sony Jean Baptiste (petitioner) earned his living as a truck driver in 1994. From January 1, 1994 to May 2, 1994, petitioner worked for Ortega Trucking (Ortega), the owner of which is Charles Ortega (Mr. Ortega). Petitioner would drive one of Ortega's trucks to Pacific Railroad where he would pick up a shipment. Petitioner would then transport this shipment to various warehouses for unloading.

Some of the warehouses to which petitioner delivered had their own employees help unload the trucks. Other warehouses did not, and petitioner would hire "lumpers" to help unload. The lumpers would wait in the vicinity of the warehouse for the trucks to come in. According to petitioner, he would negotiate a price with the lumpers and would pay them about $60 or $65 and sometimes $80. If petitioner needed help unloading a double

---

[2] Petitioners conceded that they received a tax refund of $2,535 for the 1994 taxable year.

trailer, he would pay around $125.  Since petitioner was paid per load, he hired the lumpers so he could unload quickly and then call dispatch at Ortega to see if there were more loads to be picked up.  Petitioner paid for the fuel for the truck, for which he was not reimbursed.

When hired by Ortega, petitioner was told that a portion of petitioner's earnings would be placed in an escrow account, and after 2 years of employment that account would be paid to petitioner.  Mr. Ortega also allegedly told petitioner that income taxes would be withheld from his earnings.

Petitioner was paid weekly, and with every paycheck petitioner would receive a computer printout detailing the number of "dispatches" he had, the total dispatch earnings (earnings of both the truck and the driver), and the driver earnings.  The printout also detailed the escrow amounts that were being withheld from petitioner's earnings along with other deductions such as amounts for "company advances".  The latter were repayments of amounts that were lent to petitioner to cover his lumper costs.  Escrow amounts and repayments were deducted from the driver's gross to determine take home pay.  If petitioner did not have enough earnings to cover the advances, they would be carried over to the next pay period.

For example, for the week ending March 5, 1994, the total dispatch earnings were $1,835, and the gross driver earnings were $1,152.  From the driver gross of $1,152, $120 is deducted for advances (which consists of two $60 advances), and $200 is

deducted for escrow, resulting in a net of $832 that was paid to petitioner. No taxes were withheld. Petitioner provided Ortega computer printouts for 10 weeks, and, according to the last printout, for the week ending April 30, 1994, there was a balance of $856 in escrow. Most of the advance amounts were for $60 or $80, with four for amounts of $500, $350, $250 and $120.

Also detailed on the computer printouts are "contributions" to a vehicle acquisition fund (VAF). Contributions to this fund are made weekly, but it does not appear that these contributions came from petitioner's gross wages.

Petitioner was frustrated that he was not earning as much as he had hoped working for Ortega, and he quit on May 2, 1994. According to the last printout for the week ending April 30, 1994, petitioner had gross earnings "to date" of $8,981. Petitioner argued with Mr. Ortega about money that was owed to him,[3] and Mr. Ortega agreed to pay him this money. Accordingly, subsequent to May 2, 1994, Ortega paid petitioner $1,319.

Petitioner received a Form 1099-MISC from Ortega which reflected that he earned $14,288. Petitioners did not report this income on their 1994 income tax return. Petitioners did not report this amount because they did not believe this to be the correct amount they received. In 1997, petitioners filed an

---

[3] Petitioner testified that there were weeks when he was not paid. Petitioner did not provide printouts for 7 consecutive weeks from Mar. 12, to Apr. 23, 1994. According to the "year-to-date earnings" reflected on the printouts for the weeks prior to and after this period, petitioner grossed $1,429 in those 7 weeks.

amended 1994 return which included a Schedule C for petitioner's truck driving.  On the Schedule C, petitioners reported gross income of $10,300; they arrived at this amount by adding $8,981, the gross earnings to date listed on the April 30, 1994, computer printout, to $1,319 which petitioner received from Ortega that May.  Petitioners claimed the following expenses:

| Expense | Amount |
| --- | --- |
| Taxes and licenses | $650 |
| Travel | 350 |
| Wages | 1,190 |
| Uniforms | 27 |
| Fuel | 804 |
| Beeper | 72 |
| Tools | 150 |
| Truck rent | 1,878 |
| Unpaid dispatch | 1,690 |
| Total | 6,811 |

Petitioners reported a net profit of $3,489 and self-employment tax of $493.[4]  Petitioners did not provide any additional documentation to substantiate these expenses.  Both the original and amended 1994 returns were prepared by H & R Block.

In 1995, petitioners filed a claim against Mr. Ortega for $5,000 in small claims court.[5]  Petitioners won their case, but Mr. Ortega never paid.  Respondent attempted to serve Mr. Ortega

[4]  Because of our holding in this case, respondent's determination of increased self-employment tax (and the concomitant self-employment tax deduction) will be recomputed under Rule 155.

[5]  Subsequent to trial, petitioners filed a motion to supplement the record primarily to submit copies of documents relating to this court action.  Respondent filed an objection thereto.  Upon review, we shall grant petitioners' motion and receive the additional documents.  They have only been relied upon for our finding as to dates and the amount claimed by petitioners.

with a subpoena, but was informed that Mr. Ortega had sold the business and left the country.

Discussion

Respondent contends that petitioners failed to report $14,288 in income, while petitioners contend that they received a lesser amount. Petitioner acknowledges that he received income from Ortega in 1994, but not $14,288. Petitioner introduced credible testimony and documents which persuade us that the amount of income reported on Form 1099-MISC received by respondent was incorrect. We agree with the amount that petitioners reported on Schedule C attached to the amended return; i.e., $10,300 in gross receipts. Therefore, petitioner received $10,300 as nonemployee compensation from Ortega in 1994.

Section 162(a) provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Taxpayers must keep sufficient records to establish deduction amounts. See sec. 6001; Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965). To be entitled to a deduction under section 162(a), a taxpayer is required to substantiate the deduction through the maintenance of books and records. In the event that a taxpayer establishes that he or she has incurred a deductible expense but is unable to substantiate the precise amount, we may estimate the amount of the deductible expense. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). We cannot estimate deductible expenses, however, unless the

taxpayer presents evidence sufficient to provide some rational basis upon which estimates may be made. <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985).

The only documentary evidence petitioner provided to substantiate the claimed deductions were the computer printouts. Petitioner testified that he no longer had any receipts or other records. Petitioner did not offer any testimony regarding taxes and licenses, travel, uniforms, beeper, and tools. We assume that petitioners have conceded these issues. Therefore, we shall address only the expenses for wages, truck rent, fuel, and unpaid dispatch.

Petitioners claimed an expense for wages in the amount of $1,190. This expense was for the amounts that petitioner paid the lumpers to help unload the trucks. Petitioner would obtain advances from Ortega for this purpose. Repayment of these advances would be made by deductions from petitioner's wages. The computer printouts from Ortega substantiate petitioner's claim. We find that petitioners have substantiated the amount that petitioner paid the lumpers and are entitled to a deduction of $1,190.[6]

Petitioners deducted $1,878 for truck rent. Petitioner testified that this amount is composed of the escrow balance and the VAF. After studying the computer printouts, we find that no

---

[6] We note that according to the printouts, petitioner received $2,410 in company advances. Some of these advances were for large amounts and may have been for other purposes that petitioner did not specify.

amounts were deducted from petitioner's gross wages for the VAF. On the other hand, as of April 30, 1994, $866 had been deducted from petitioner's gross income for the escrow balance. Therefore, petitioners are entitled to a deduction of $866.

Petitioners claimed a deduction for fuel of $804. Petitioner testified that he had to purchase fuel for the trucks out of his own pocket. Ortega did not have a fuel pump on its premises; therefore the drivers had to obtain fuel offsite. Petitioners did not provide any documentation to support this claimed expense deduction. However, petitioner was a credible witness, and we find that this was an ordinary and necessary expense which petitioner incurred. Therefore, petitioners are entitled to a deduction for fuel in the amount of $500. Cohan v. Commissioner, supra.[7]

The deduction for unpaid dispatch is the difference between the dispatch total the company earned and the driver's total earnings. This amount was never included in petitioner's gross income, was not paid by petitioner, and is therefore not deductible.

---

[7] Typically, expenses for fuel, if purchased in connection with listed property under sec. 280F(d)(4)(A)(i) and (ii), must meet the strict substantiation requirements of sec. 274(d) and Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), cannot be applied. However, that rule does not apply for "any property substantially all of the use of which is in a trade or business of providing to unrelated persons services consisting of the transportation of persons or property for compensation or hire." Sec. 280F(d)(4)(C).

Accuracy-Related Penalty

In the notice of deficiency, respondent determined that petitioners were liable for the accuracy-related penalty under section 6662(a) "due to substantial understatement of tax". Section 6662(a) imposes a penalty of 20 percent of the portion of the underpayment which is attributable to any substantial understatement of income. See sec. 6662(b)(2). There is a substantial understatement of income tax for any year if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1). Consequently, due to our holdings on the other issues, if the Rule 155 computation does not indicate that petitioners' understatement of tax exceeded the greater of 10 percent of the amount of tax required to be shown on the return or $5,000, petitioners will not be liable for the section 6662 accuracy-related penalty due to substantial understatement of tax.

In the alternative, counsel for respondent raised in her trial memorandum the issue that petitioners negligently failed to report the income from Ortega and, therefore, are liable for the section 6662 penalty for negligence or disregard of rules or regulations. Where respondent raises a new issue after the issuance of the notice of deficiency, respondent bears the burden of proof. See Rule 142(a).

Section 6662(a) imposes a penalty of 20 percent on the portion of the underpayment which is attributable to negligence

or disregard of rules or regulations. See sec. 6662(b)(1). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. See sec. 6662(c).

However, section 6664(c) provides that no penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Thus, respondent must prove that a portion of the underpayment is attributable to negligence and that petitioners did not act with reasonable cause and in good faith.

Petitioners are not sophisticated with regard to income tax laws and had their return prepared by H & R Block. While petitioners disclosed to their preparer that they had income from Ortega and that there was a dispute about the correct amount of income earned, petitioners knew the amount of income earned and paid from Ortega, as well as their expenses. Petitioner was involved in a dispute with Ortega over the amount of his income and had to file an ultimately unsuccessful lawsuit against Mr. Ortega. However, that lawsuit was resolved in 1995, but

petitioner did not file an amended 1993 income tax return until 1997, after the commencement of respondent's audit.  We hold that respondent has proved that petitioners were negligent and did not act with good faith and reasonable cause with respect to the unreported net income from Ortega.  Accordingly, petitioners are liable for the accuracy-related penalty for negligence under section 6662(a).

To reflect the foregoing,

Decision will be entered

under Rule 155.